

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-6-1996

# Philbin v. Trans Union Corp

Precedential or Non-Precedential:

Docket 96-5030

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Philbin v. Trans Union Corp" (1996). *1996 Decisions.* Paper 8.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/8

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 96-5030


JAMES R. PHILBIN, JR.

v.

TRANS UNION CORPORATION; TRW CREDENTIALS

JAMES PHILBIN, JR.,

Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 93-cv-02360)


Argued October 28, 1996

BEFORE:  SCIRICA and COWEN, Circuit Judges
and FEIKENS, District Judge*

(Filed December 6, 1996)


Daniel J. de Luca, Esq. (argued)
510 White Horse Pike
Audobon, NJ  08106

        COUNSEL FOR APPELLANT
        James R. Philbin, Jr.

Mark E. Kogan, Esq. (argued)
Marion, Satzberg, Trichon & Kogan
1735 Market Street
3000 Mellon Bank Building
Philadelphia, PA  19103

        COUNSEL FOR APPELLEE
        Trans Union Corporation



*Honorable John Feikens, United States District Judge for the
 Eastern District of Michigan, sitting by designation.
Dorothy A. Kowal, Esq. (argued)
Stoldt & Horan

401 Hackensack Avenue
Hackensack, NJ  07601

        COUNSEL FOR APPELLEE
        TRW Credentials


OPINION



COWEN, Circuit Judge.

Plaintiff James R. Philbin, Jr. appeals two orders of the district court, the first dated November 29, 1994, and the second and final order dated December 8, 1995, granting summary judgment in favor of the defendants.  This appeal raises issues regarding the elements of a cause of action pursuant to § 607(b) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b), and the nature of plaintiff's burden in demonstrating a prima facie case pursuant to such a cause of action, questions we have not yet had occasion to address.  For the reasons that follow, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings.

I.

At some unspecified point in time, defendant Trans Union Corp. ("TUC"), a credit reporting service, prepared a credit report regarding Philbin that erroneously stated he was subject to a tax lien in the amount of approximately $9500.  Apparently, TUC had him confused with his father, James R. Philbin, Sr.  Plaintiff states in an affidavit that he has never been delinquent on any financial obligation. App. at 8.  That statement has never been shown to be false, nor has it ever been denied by defendants.  Philbin first notified TUC of the error in April of 1990.  TUC corrected the error and added a notation to the credit report reading: "Do not confuse with father James Philbin Sr different address different social security number." App. at 14.

Defendant TRW Credentials, Inc. ("TRW") had also apparently prepared a false credit report on Philbin, although there is no evidence of what inaccuracies it contained.  In the spring of 1990, Philbin's attorney wrote a letter to TRW demanding that it correct its report.  Philbin apparently did not have any further complaints with TRW until approximately two-and-a-half years later.

In July of 1990, Philbin applied for and was denied credit at Macy's department store.  The reasons given were that his "credit profile shows delinquent past or present credit obligations with others" and "insufficient favorable credit experience." App. at 15.  Macy's relied in whole or in part on the TUC report.  Philbin requested and received a copy of his credit report from TUC, which he concedes was wholly accurate.

In February of 1992, Philbin applied for and was denied a $1500 loan by Household International Company. The decision was based in whole or in part on information received from TUC, but Household gave no reasons for its decision. That April, Philbin filed a complaint against TUC with the New Jersey Department of Law and Public Safety. That agency forwarded Philbin's complaint to the Federal Trade Commission ("FTC"). Two months later, Philbin was denied a loan of approximately $10,000 from Bayview Marina based in whole or in part on information received from TUC. The reason given was "insufficient credit file." App. at 25.

That November, Philbin was denied credit from four different credit granting agencies. Philbin's application for a credit card from Circuit City electronics store was denied by the First North American National Bank, based in whole or in part on information received from TUC. The reasons given for the denial were "number of other recent credit inquiries" and "high utilization of bankcard credit lines." App. at 31. He applied for a credit card from Sears department store and was denied credit based in whole or in part on information received from both TUC and TRW. The reasons given were "unfavorable credit history," "number of credit bureau inquiries," and "number of open accounts." App. at 27. He was denied a Best Products credit card from Bank One based in whole or in part on information received from TUC. The reasons given were "sufficient pay history not established," and "limited credit experience." App. at 28. Finally, Philbin was denied a credit card by Citibank based in whole or in part on information received from TRW. The reason given was that "a delinquent credit obligation[] was recorded on [the] credit bureau report." App. at 44.

Fearing that these successive denials of credit were due to inaccuracies in his credit reports, Philbin requested a copy of his report from both TUC and TRW. TRW promptly sent him a copy of his report, which Philbin concedes contained no inaccuracies, indicating no delinquencies and listing six open accounts.

Ten days after the request to TUC was made, TUC informed him that the address he had provided them did not match the address in their records and requested that he send them proof of residence. The address to which he wished the report sent was the same address to which the 1990 report had been sent. However, other evidence in the record reflects that Philbin used two addresses. Philbin complied and, several weeks later, he received a copy of his TUC report. It erroneously stated that he had been released from a $9580 tax lien. Philbin states that he notified TUC about the error immediately.

In May of 1993, after having filed the complaint in the instant litigation, Philbin applied for a $5000 loan from Nation's Credit, which informed him that it was inclined to deny him the loan based in whole or in part on information received from TUC and TRW. He obtained from Nation's Credit a copy of the TUC report. Like the report he received directly from TUC the previous year, it erroneously stated that he had been released from a $9580 tax lien. Philbin also obtained the TRW

report from Nation's Credit. That report, in addition to containing correct information regarding him, erroneously listed twelve open accounts, one currently delinquent account, and four past delinquent accounts. This information apparently pertained to Philbin's father, not to him.

On April 22, 1993, Philbin filed the instant suit in the Superior Court of New Jersey, Camden County, charging TUC and TRW with violations of the FCRA. He claimed that as a result of the inaccurate reporting of his credit history and the subsequent denials of credit, he suffered "deep humiliation and embarrassment . . . and will continue to suffer injury to his credit, reputation and financial standing." App. at 3, 5. He stated in an affidavit that he has suffered the humiliation and embarrassment of not being able to purchase items necessary to his business without the help of his father. App. at 8. Finally, he stated that he "suffered economic injury from the inability to establish credit so that [he] can pursue investment opportunities in real property." App. at 8.

TUC and TRW removed the case to the district court. They subsequently moved for summary judgment dismissing the complaint pursuant to Fed. R. Civ. P. 56 on the grounds that Philbin had not produced sufficient evidence to make out a prima facie case of either willful or negligent noncompliance with § 1681e(b). On November 29, 1994, the district court granted TRW's motion for summary judgment; granted TUC's motion for summary judgment on the issue of willful noncompliance with § 1681e(b); and denied TUC's motion for summary judgment on the issue of negligent noncompliance with § 1681e(b).

In preparation for trial, the parties filed a Joint Pre-Trial Order, paragraph six of which stated: "None of the letters from the creditors . . . mentions a tax lien as a reason for denial of credit." TUC's Mem. of Law at 6. Based on this, TUC moved for reconsideration of the portion of its motion for summary judgment that had been denied. On reconsideration, the district court held that, pursuant to the stipulation contained in the Joint Pre-Trial Order, Philbin would not be able to produce any evidence that the denials of credit by the credit granting agencies were caused by the inaccurate entry on the TUC report. The district court concluded that he would therefore not be capable of sustaining his burden of proof on at least one element of his prima facie case. Accordingly, the district court vacated that portion of its November 29, 1994, order denying summary judgment to TUC, granted TUC's motion for summary judgment, and dismissed the complaint. This appeal followed.

II.

The FCRA was enacted in order to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The FCRA was prompted by "congressional concern over abuses in the credit reporting industry." Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th

Cir. 1995); see also St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 883 (5th Cir. 1989). In the FCRA, Congress has recognized the crucial role that consumer reporting agencies play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole. See 15 U.S.C. § 1681(a)(1), (3).

Title 15 U.S.C. § 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." It is undisputed that TUC and TRW are "consumer reporting agenc[ies]" within the terms of 15 U.S.C. § 1681a(f), the credit reports they produced are "consumer report[s]" within the meaning of § 1681a(d), and Philbin is a "consumer" for purposes of § 1681a(c). Sections 1681n and 1681o of Title 15 respectively provide private rights of action for willful and negligent noncompliance with any duty imposed by the FCRA and allow recovery for actual damages and attorneys fees and costs, as well as punitive damages in the case of willful noncompliance. See Casella v. Equifax Credit Information Servs., 56 F.3d 469, 473 (2d Cir. 1995), cert. denied, 116 S.Ct. 1452 (1996); Guimond, 45 F.3d at 1332; Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1156 & n.4 (11th Cir. 1991).

## A.

The parties agree that a case of negligent noncompliance with § 1681e(b) consists of four elements: (1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry. See Morris v. Credit Bureau of Cincinnati, Inc., 563 F. Supp. 962, 967 (S.D. Ohio 1983); Bryant v. TRW, Inc., 487 F. Supp. 1234, 1238 (E.D. Mich. 1980), aff'd, 689 F.2d 72 (6th Cir. 1982). Defendants do not dispute they both produced at least one report that contained inaccurate information about Philbin. Nor do they contest that Philbin's emotional distress damages are cognizable. See Guimond, 45 F.3d at 1333; Stevenson v. TRW Inc., 987 F.2d 288, 296 (5th Cir. 1993); Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834–35 (8th Cir. 1976). Moreover, TUC apparently concedes that Philbin has satisfied his burden on summary judgment of producing facts from which a reasonable jury could infer that it did not follow reasonable procedures. As other courts have held, "[a]llowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent." Stevenson, 987 F.2d at 293; see also Morris, 563 F. Supp. at 968.

As their main contention, both defendants urge that Philbin has failed to produce sufficient evidence from which a reasonable trier of fact could conclude that the inaccuracies in the reports were the cause of Philbin's damages. TRW additionally contends that Philbin has failed to produce any evidence that it failed to follow reasonable procedures. We address these contentions in

reverse order.

# 1.
## Reasonable Procedures

Reasonable procedures are those that "`a reasonably prudent person would [undertake] under the circumstances.'" Stewart v. Credit Bureau, Inc., 734 F.2d 47, 51 (D.C. Cir. 1984) (per curiam) (quoting Bryant v. TRW, Inc., 689 F.2d 72, 78 (6th Cir. 1982)) (alteration added). "Judging the reasonableness of a[ credit reporting] agency's procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." Id.

TRW urges that Philbin must come forward with affirmative proof that it failed to use reasonable procedures to assure maximum accuracy and that he has failed to do so. It cites a number of cases for the proposition that the FCRA "does not make reporting agencies strictly liable for all inaccuracies" that appear on a consumer report it prepares. Cahlin, 936 F.2d at 1156; see also Stewart, 734 F.2d at 51; Bryant, 689 F.2d at 78; Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 513 (5th Cir. 1982) (per curiam); Equifax, Inc. v. Federal Trade Commission, 678 F.2d 1047, 1049 (11th Cir. 1982); Hauser v. Equifax, Inc., 602 F.2d 811, 814 (8th Cir. 1979); Neptune v. Trans Union Corp., 1993 WL 505601, at *2 (E.D. Pa. Dec. 8, 1993), aff'd, 27 F.3d 558 (3d Cir. 1994); Hussain v. Carteret Sav. Bank, F.A., 704 F. Supp. 567, 569 (D.N.J. 1989).

TRW accurately states that consumer reporting agencies are liable only when inaccuracies are the result of their failure to follow reasonable procedures. However, this statement gives little guidance as to the nature of the plaintiff's burden of proof on the "reasonable procedures" issue on a motion for summary judgment. We must determine the nature and quantum of proof, if any, beyond the mere fact of an inaccuracy, that a plaintiff must provide in order for a reasonable trier of fact to conclude that reasonable procedures were not followed.

We are guided in this endeavor by those courts of appeals that have addressed this question. We note, however, that there is a divergence among the approaches those courts have taken. In Stewart, 734 F.2d at 51 n.5, the Court of Appeals for the District of Columbia Circuit noted that although it was unaware of any cases "directly addressing who has the burden of proving reasonableness of procedures, courts have generally assumed that burden falls on the plaintiff" (citing Hauser, 602 F.2d at 814–15; Morris, 563 F. Supp. at 968; Alexander v. Moore & Assocs., Inc., 553 F. Supp. 948, 954 (D. Haw. 1982)). Accordingly, it held that

> a plaintiff cannot rest on a showing of a mere inaccuracy, shifting to the defendant the burden of proof on the reasonableness of procedures for ensuring accuracy: There is no indication that Congress meant to so shift the nominal plaintiff's burden of proof as to requisite components of a claim based on a statutory violation. Thus, we conclude that a plaintiff must minimally present some

> evidence from which a trier of fact can infer
> that the consumer reporting agency failed to
> follow reasonable procedures in preparing a
> credit report.

Id. at 51 (footnote omitted) (emphasis added).
However, the court went on to hold that, in order to satisfy this "minimal[]" burden, "a plaintiff need not introduce direct evidence of unreasonableness of procedures:  In certain instances, inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures, and . . . in such instances plaintiff's failure to present direct evidence will not be fatal to his claim."  Id. at 51-52 (emphasis added).  While the Stewart court did not definitively spell out what those "certain instances" were, it did give some guidance.  For example, it cited with approval Bryant, 487 F. Supp. at 1242, in which the court concluded that inconsistencies between two different reports concerning the plaintiff "imposed a duty on the reporting agency to verify the information in those reports."  Stewart, 734 F.2d at 52.  The court also approvingly cited Morris, 563 F. Supp. at 968, in which the court likewise found "the existence of . . . two similar files [on plaintiff] to be a sufficient indicium of unreasonable procedures to satisfy the plaintiffs' `burden.'"  Stewart, 734 F.2d at 52.  The D.C. Circuit concluded:  "Certainly . . . inconsistencies between two files or reports involving less fundamental inaccuracies [than a falsely reported wage earner plan] can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information."  Id.

In an even broader holding, the Court of Appeals for the Ninth Circuit recently wrote:

> In order to make out a prima facie violation
> under § 1681e(b), a consumer must present
> evidence tending to show that a credit
> reporting agency prepared a report containing
> inaccurate information.  The FCRA does not
> impose strict liability, however -- an agency
> can escape liability if it establishes that
> an inaccurate report was generated despite
> the agency's following reasonable procedures.

Guimond, 45 F.3d at 1333 (emphasis added) (citation and footnote omitted); see also id. at 1334 ("Guimond has made out a prima facie case under § 1681e(b) by showing that there were inaccuracies in her credit report.").  Similarly, the Court of Appeals for the Eleventh Circuit wrote:

> In order to make out a prima facie violation
> of [§ 1681e(b)], the Act implicitly requires
> that a consumer must present evidence tending
> to show that a credit reporting agency
> prepared a report containing "inaccurate"
> information. . . .  The Act, however, does
> not make reporting agencies strictly liable
> for all inaccuracies.  The agency can escape

liability if it establishes that an
inaccurate report was generated by following
reasonable procedures, which will be a jury
question in the overwhelming majority of
cases.  Thus, prior to sending a [§ 1681e(b)]
claim to the jury, a credit reporting agency
can usually prevail only if a court finds, as
a matter of law, that a credit report was
"accurate."

Cahlin, 936 F.2d at 1156 (emphasis added) (footnotes omitted).

The language from Guimond and Cahlin may be interpreted in two different ways.  A broader reading is that, once a plaintiff demonstrates inaccuracies in a credit report, the burden shifts to the defendant to prove as an affirmative defense the presence of reasonable procedures.  But see Stewart, 734 F.2d at 51 n.5 (citing 15 U.S.C. §§ 1681d(c) and 1681m(c) for the proposition that Congress "`knew how' to shift the burden of proof from plaintiff to defendant by explicitly doing so").

A somewhat narrower, and more plausible, reading is that a plaintiff may present his case to the jury on the issue of reasonable procedures merely by showing an inaccuracy in the consumer report and nothing more, but the burden does not shift to the defendant.  Rather, a jury may, but need not, infer from the inaccuracy that the defendant failed to follow reasonable procedures.

This position imposes a less stringent burden on the plaintiff than does the position taken in Stewart, which requires some unspecified quantum of evidence beyond a mere inaccuracy, such as the existence of a second report, inconsistent with the first, in order for a plaintiff to survive summary judgment.  On the other hand, it does not entirely relieve the plaintiff of his burden of proving to the jury a lack of reasonable procedures and instead impose on the defendant an affirmative obligation to prove that reasonable procedures were in place.

This "middle position" is akin to the common law rule of resipsa loquitur, which permits but does not require the jury to infer negligence from certain predicate facts.  See Restatement (Second) of Torts § 328 D (1965).          The justification for importing
such a rule into the FCRA context would be that, as in
the
traditional res ipsa situation, the inaccuracy has
been caused by
an instrumentality under the exclusive control of the
defendant.
Such a defendant is in a far better position to prove
that
reasonable procedures were followed than a plaintiff
is to prove
the opposite.
Pursuant to either reading of Guimond and Cahlin,
once a

a
were to
that the
Henson, 29
agency is
information
notice from
inaccurate.").
a plaintiff
order to
procedures; that the
procedures from
demonstrating an
prove that
unnecessary to
Guimond and
survive
merely by
report.
plaintiff
reasonable trier of
procedures.
inaccurate
evidencing
As one
posited that
and the

plaintiff has demonstrated inaccuracies in the report, defendant could prevail on summary judgment only if it produce evidence that demonstrates as a matter of law procedures it followed were reasonable. See, e.g., Henson, 29 F.3d at 285 ("[A]s a matter of law, a credit reporting not liable under the FCRA for reporting inaccurate obtained from a court's Judgment Docket, absent prior the consumer that the information may be

Having discussed these three possibilities (that must produce some evidence beyond a mere inaccuracy in demonstrate the failure to follow reasonable procedures; that the jury may infer the failure to follow reasonable the mere fact of an inaccuracy; or that upon inaccuracy, the burden shifts to the defendant to reasonable procedures were followed), we find it decide among them. Pursuant to either reading of Cahlin, plaintiff has produced sufficient evidence to summary judgment on the issue of reasonable procedures demonstrating that there were inaccuracies in the TRW Moreover, even under the rule enunciated in Stewart, has produced sufficient evidence from which a fact could infer that TRW did not follow reasonable The court there stated that "[i]n certain instances, credit reports by themselves can fairly be read as unreasonable procedures." Stewart, 734 F.2d at 52. specific example of such an instance, the court where there exist two or more inconsistent reports,

inconsistency relates to inaccurate information contained in at least one of the reports, a jury could reasonably conclude that the defendant failed to follow reasonable procedures. Here, TRW issued two reports that were inconsistent with each other. Unquestionably, one was inaccurate. The inconsistencies related to the inaccurate information. Pursuant to Stewart, and a fortiori pursuant to either of the two readings of Guimond and Cahlin, these facts alone are sufficient to allow a jury to infer that TRW did not follow reasonable procedures.

### 2.
### Causation

Both TUC and TRW contend that there is no evidence that the inaccuracy of the credit reports, even if the result of unreasonable procedures, caused Philbin's injuries. Given the existence of one accurate and one inaccurate report prepared by each agency, they claim that there is no evidence from which a reasonable trier of fact could infer both (1) that the credit granting agencies utilized the inaccurate as opposed to the accurate versions; and (2) even assuming that the inaccurate versions were used, that the inaccurate entries were the cause of the denial of credit.

The district court agreed with defendants and granted summary judgment on this basis, holding that a "plaintiff must establish that `the denial was not caused by factors other than the alleged inaccurate entry.'" Philbin v. Trans Union Corp., No. 93-cv-2360 (JBS), at 13 (D.N.J. Dec. 8, 1995) ("Philbin II") (quoting Neptune, 1993 WL 505601 at *2)); Philbin v. Trans Union Corp., No. 93-cv-2360 (JBS), at 11 (D.N.J. Nov. 29, 1994) ("Philbin I") (quoting Neptune, 1993 WL 505601 at *2)); see alsoEvans v. Credit Bureau, 904 F. Supp. 123, 126 (W.D.N.Y. 1995);

Pendleton v. Trans Union Systems Corp., 76 F.R.D. 192, 195 (E.D. Pa. 1977) ("[A] consumer who was denied credit must show that the denial was caused by inaccurate entries . . . rather than by correct adverse entries or any other factors."). Although the district court did not say so explicitly, it appears that it concluded that Philbin could not show inaccurate information was the "but for" cause of his injury, because he could not show that the harm would not have occurred absent the inaccurate entry. While we agree with the district court that a FCRA plaintiff must prove causation by a preponderance of the evidence, we disagree that Philbin has failed to produce sufficient facts from which a reasonable jury could find that defendants' alleged negligence caused his injuries. A comparison of the record here with the facts of the cases relied upon by the district court and defendants bears this out.

In Neptune, that court did indeed find that plaintiff had not established "that the denial [of credit] was not caused by factors other than the alleged inaccurate entry." 1993 WL 505601 at *2. However, it noted:

> It is undisputed that at the time plaintiff claims he was denied credit based on TUC's violations of the Fair Credit Reporting Act, he was in default on an obligation to re-pay a student loan, he was in default on an obligation to re-pay a commercial loan from ITT Financial Services, he was failing to comply with a court order requiring him to pay child support, and he had virtually no income and no assets.

Id. The court in addition noted how unusual it was for a plaintiff to contend that he had been denied credit due to an inaccurate credit report while at the same time applying for and receiving leave to proceed in forma pauperis. See id. at *1-2. Thus, the court's statement regarding the plaintiff's burden vis-à-vis the causation issue must be read in light of the fact that there were indisputably numerous additional reasons plaintiff

could have been denied credit.

Similarly, in Evans, 904 F. Supp. at 126, the defendant introduced affidavit testimony from an employee of the credit granting agency that plaintiff had been denied a loan because he had filed for bankruptcy within two years prior to the loan application. The presence of undisputed, correct, adverse information on the credit report, along with the unrebutted testimony of one responsible for the credit-granting decision, arguably supports the conclusion that no reasonable jury could conclude that the presence of inaccurate entries on the reports made a difference as to the decision whether to grant or deny credit.

In Cahlin, 936 F.2d at 1156, 1161, the Eleventh Circuit upheld a grant of summary judgment to the defendant only after all of the credit grantor's records had been subpoenaed and there was no indication that an adverse credit report prepared by the defendant had ever been used in making the credit decision, much less any indication that such a report had been a causal factor in the decision. See also Wood v. Holiday Inns, Inc., 508 F.2d 167, 172 (5th Cir. 1975).

In contrast with these cases, the facts of the instant case more closely resemble those in Lendino v. Trans Union Credit Information Co., 970 F.2d 1110, 1111-12 (2d Cir. 1992), in which adverse outdated information was included on one of three credit reports concerning the plaintiff prepared by the defendant, in violation of 15 U.S.C. § 1681c. The other two reports contained "no delinquent credit accounts or any other adverse information." Id. at 1112. The plaintiff was denied credit by Bloomingdale's department store after its credit department reviewed one or more of the three reports, but it is unclear which of the reports it had seen. See id. at 1112-13. Although the only report that indicated it had been accessed by Bloomingdale's was one of the valid versions, the plaintiff testified that an employee of the defendant told him that Bloomingdale's had obtained all three reports. See id. at 1112. The district court granted summary judgment to the defendant based on the conclusion that there was no evidence that the credit grantor had seen the invalid version of the report. See id. at 1111-12.

The Second Circuit reversed, holding that a reasonable jury could indeed infer that Bloomingdale's had seen the invalid report and denied plaintiff credit based on that report, because "[t]here is, at least on the present record, no other evidence which reasonably demonstrates why Bloomingdale's rejected Lendino's credit application." Id. at 1113. At oral argument, counsel for TUC was unable persuasively to distinguish Lendino from the instant case.

Here, the district court originally held that because the accurate report prepared by TUC appeared to contain no delinquent accounts, and because Philbin stated in his affidavit that he has never been delinquent on an account (which statement is not disputed by defendants), Philbin could convince a jury, "by process of elimination," Philbin I at 19, that the credit granting agencies must have both used the inaccurate report and considered the inaccurate information on that report in reaching

their decisions to deny credit. On reconsideration, however, in light of the stipulation in the Joint Pre-Trial Order that none of the rejection letters specifically cites the erroneous information, the district court reversed itself and granted summary judgment to TUC.

With respect to TRW, the report Philbin received in November of 1992, contemporaneously with the denials of credit from Sears and Citibank, was concededly correct. The inaccurate TRW report, which he received from a credit granting agency, was received six months later. The district court concluded that Philbin's contention that Sears and Citibank used the inaccurate report rather than the accurate one was sheer speculation, and therefore granted summary judgment to TRW.

As a preliminary matter, we must acknowledge that we are at a loss to explain the consequence ascribed by the district court to the stipulation in the Joint Pre-Trial Order that none of the rejection letters specifically cites the inaccurate information. At the time of its initial determination, discovery was complete and Philbin had failed to submit any deposition or affidavit testimony of those individuals who had made the decisions to deny him credit. Thus, both initially and on reconsideration, the rejection letters (which omit to state that the erroneous entry was the cause of the denial of credit), the fact that the accurate reports contained no adverse information, Philbin's statement that he had never been delinquent on an account, and the "process of elimination" argument to be drawn from this evidence were all that Philbin could have presented to a jury. Yet these were deemed sufficient initially as against TUC and insufficient on reconsideration.

More fundamentally, the district court erred by assuming that Philbin could satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit. While Philbin's case might have been stronger had he deposed or taken affidavits of those responsible for the decision, such evidence is not essential to make out a prima facie case pursuant to § 1681e(b). We deem it sufficient that, as with most other tort actions, a FCRA plaintiff produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit. Restatement (Second) of Torts § 431(a); Keeton et al., Prosser and Keeton on Torts § 41, at 266-68 (5th ed. 1984) [hereinafter Prosser & Keeton]. Philbin has met that burden in this instance as to each of the six credit denials encompassed by his complaint.

Because the accurate reports apparently contained no adverse information and because it is undisputed that Philbin has never been delinquent on a credit obligation, when Sears denied him credit because of an "unfavorable credit history," App. at 27, a reasonable jury certainly could infer that Sears was referring to the inaccurate adverse information contained in the inaccurate reports. See Lendino, 970 F.2d at 1113.

Household International gave no reason for the denial of credit. Again, however, given the absence of correct, adverse information concerning Philbin, a trier of fact could reasonably

infer, by necessary implication, that the inaccurate adverse information must have played a substantial role in its decision to deny credit.

Finally, three credit grantors -- Bayview Marina, Bank One, and First North American Bank -- gave reasons for denying credit that appear to be innocuous. These include: "insufficient credit file," "sufficient pay history not established," "limited credit experience," "number of other recent credit inquiries," and "high utilization of bankcard credit lines." App. at 25, 28, 31. While these present a closer question, we conclude that a trier of fact could reasonably infer that the inaccurate adverse information included on the inaccurate credit report was an additional, unstated reason for the credit denials. Moreover, as to Bank One, which stated that it denied credit because of Philbin's lack of credit history, one could infer that this lack of a credit history was itself due, at least in part, to his inability to get credit because of the inaccurate reports.

Philbin's case against TRW is somewhat more attenuated than his case against TUC, given that the inaccurate report surfaced some six months after the denial of credit by Sears and Citibank. However, we find that evidence of the existence of two inconsistent reports within six months of each other allows a reasonable trier of fact to infer that the two reports existed simultaneously in November of 1992, at the time of the denials of credit. This, taken along with the fact that the accurate report apparently contained no information adverse to Philbin and the undisputed fact that he has never been delinquent on any credit obligation, would allow a reasonable trier of fact to infer both that Citibank and Sears saw the inaccurate TRW report and that the inaccurate information was a substantial factor in bringing about the denial of credit. See Lendino, 970 F.2d at 1113. This is especially true given that the reasons supplied by Sears for the denial included "unfavorable credit history," and the reason supplied by Citibank was "a delinquent credit obligation[] was recorded on [the] credit bureau report." App. at 27, 44.

We note also that the district court's language might be understood as imposing a burden on a FCRA plaintiff of proving that the inaccurate information was the sole cause of the denial of credit. We reject such a view as inconsistent with traditional notions of tort law and the reality of human decision-making. While a plaintiff must prove that the inaccurate entry was "a substantial factor in bringing about" the denial of credit, Restatement (Second) of Torts § 431(a), he need not eliminate the possibility that "correct adverse entries or any other factors," Pendleton, 76 F.R.D. at 195, also entered into the decision to deny credit. See Cahlin, 936 F.2d at 1161 (plaintiff "bears the burden of proving that [defendant's] credit report was a causal factor in the denial of" credit) (emphasis added); Stewart, 734 F.2d at 54 ("[A] trier of fact could reasonably conclude that [defendant] denied [plaintiff] membership at least in part because of the adverse credit report, and summary judgment was inappropriate.") (emphasis added); seealso Prosser & Keeton § 41, at 268 ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it

follows that he will not be absolved from liability merely because other causes have contributed to the result . . . .").

Forcing a plaintiff affirmatively to rule out other explanations for the credit denial ignores the fact that decisions to deny credit will frequently have more than one cause. For example, in some instances the inaccurate entry and another factor may each, considered separately, be insufficient to have caused the denial of credit but when taken together are sufficient. Each may then be considered a substantial factor in bringing about the denial of credit and therefore a cause of plaintiff's injury. See Prosser & Keeton § 41, at 266–67 & n.25.

Courts have recognized that where a decision–making process implicates a wide range of considerations, all of which factor into the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of proving that one of those factors was the cause of the decision. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 241, 244, 109 S.Ct. 1775, 1785, 1787 (1989) (plurality opinion) (finding that "Title VII [of the Civil Rights Act of 1964] meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations," and concluding that Title VII plaintiff must show illegitimate consideration "played a motivating part in an employment decision"); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265–66, 97 S.Ct. 555, 563 (1977) (plaintiff claiming equal protection violation need not "prove that the challenged action rested solely on racially discriminatory purposes" but only that such a purpose was "a motivating factor in the decision"). Indeed, where multiple factors exist, any inquiry into the cause of a decision would be a meaningless endeavor. See Price Waterhouse, 490 U.S. at 247, 109 S.Ct. at 1788–89 (plurality opinion).

We hasten to add that the burden of proving causation remains with the plaintiff at all times and never shifts to the defendant. We conclude however that even on this sparse record, a reasonable trier of fact could infer that the inaccurate entries were a substantial factor in bringing about Philbin's injuries. Accordingly, Philbin has produced evidence sufficient to satisfy his burden of proving a prima facie case of negligent noncompliance with 15 U.S.C. § 1681e(b) as to each defendant.

B.

By contrast, we agree with the district court that Philbin has not produced sufficient evidence of willful noncompliance with § 1681e(b) to survive summary judgment. To show willful noncompliance with the FCRA, Philbin must show that defendants "knowingly and intentionally committed an act in conscious disregard for the rights of others," but need not show "malice or evil motive." Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986), cert. denied, 483 U.S. 1022, 107 S.Ct. 3267 (1987); seealso Casella, 56 F.3d at 476.

Philbin claims that TUC is liable for a willful violation because he notified it of the error several times and TUC failed to correct it. However, after the first notification, in 1990, TUC did remove the erroneous information for a period of time. Moreover, he contends that his filing of a complaint with the FTC

gave TUC notice a second time, but there is no evidence that TUC had notice of the complaint. There appears to be one instance -- in November of 1992 -- when he notified TUC that, despite the earlier correction, the error re-appeared, and TUC failed to correct it. This, however, falls short of evidence of a willful violation.

Philbin also claims that TUC's refusal to send him a copy of his credit report in November of 1992 evidences a willful violation. However, it appears that TUC merely desired to verify his address. Moreover, the record reflects that Philbin had two mailing addresses, and so TUC's concern appears to be bona fide. After receiving verification of his address, TUC eventually sent him a copy of the report. Its actions do not rise to the level of a "willful misrepresentation[] or concealment[]" that justifies finding a willful violation. Pinner, 805 F.2d at 1263; cf. Millstone, 528 F.2d at 834.

Philbin's case against TRW for a willful violation is even weaker. He claims that after the 1990 letter and the 1992 filing with the FTC, TRW had notice of the inaccuracies and nonetheless circulated the inaccurate report. However, there is no evidence that the alleged errors that precipitated the 1990 letter are the same as those that appeared on the 1993 report. Moreover, the 1990 letter is so far removed temporally from the 1993 report that it would strain the concept of notice to conclude that the former provided notice of errors in the latter. Further, Philbin's FTC filing concerned his problems only with TUC, not TRW. There is, therefore, no evidence of willful behavior on the part of TRW.

### III.

The order of the district court, dated November 29, 1994, granting summary judgment to both defendants as to the claims for willful noncompliance with § 1681e(b) will be affirmed. The orders dated November 29, 1994, and December 8, 1995, granting summary judgment to defendants as to the claims for negligent noncompliance with § 1681e(b) will be reversed. The matter is remanded to the district court for further proceedings consistent with this opinion.

Costs taxed against appellees.